IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil No. 2:13-cv-2221 |
| | ) | |
| MARKEY GRANBERRY, DERRICK | ) | |
| ROBINSON, EUMORA REESE, | ) | |
| individually and d/b/a MO' MONEY | ) | |
| TAXES, MONEYCO USA LLC, | ) | |
| CAYMAU SERVICE BUREAU LLC, | ) | |
| MARQUIS TAXES, and SOUTHERN | ) | |
| KING TAXES, | ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT FOR PERMANENT INJUNCTION AND OTHER RELIEF

The United States of America, for its complaint against Markey Granberry, Derrick

Robinson, and Eumora Reese, individually and doing business as Mo' Money Taxes, MoneyCo

USA LLC, Caymau Service Bureau LLC, Marquis Taxes, and  Southern King Taxes

(collectively, "the Defendants"), alleges as follows:

1.      This is a civil action brought by the United States under I.R.C. (26 U.S.C.) §§

7402, 7407, and 7408 to enjoin the Defendants, and anyone in active concert or participation

with them, from:

(1)      acting as federal tax return preparers or requesting, assisting in, or
directing the preparation or filing of federal tax returns, amended returns,
or other related documents or forms for any person or entity other than
themselves;

(2)      preparing or assisting in preparing federal tax returns that they know or
reasonably should know would result in an understatement of tax liability
or the overstatement of federal tax refund(s) as penalized by I.R.C.
§ 6694;

(3)    owning, operating, managing, working in, controlling, licensing, or franchising a tax return preparation business;

(4)    falsifying or fabricating Forms W-2 or any other IRS form, filing false or fabricated Forms W-2 or any other IRS form, or aiding and abetting with the falsification or fabrication of or filing of false or fabricated Forms W-2 or any other IRS form;

(5)    preparing or assisting in preparing federal tax returns that are based on end-of-year pay stubs rather than Forms W-2;

(6)    engaging in any other activity subject to penalty under I.R.C. §§ 6694, 6695, 6701, or any other penalty provision in the I.R.C.; and

(7)    engaging in any conduct that substantially interferes with the proper administration and enforcement of the internal revenue laws.

## Jurisdiction and Venue

2.    This action has been requested by the Chief Counsel of the Internal Revenue Service, a delegate of the Secretary of the Treasury, and commenced at the direction of a delegate of the Attorney General, pursuant to I.R.C. §§ 7402, 7407, and 7408.

3.    Jurisdiction is conferred on this Court by 28 U.S.C. §§ 1340 and 1345 and I.R.C. §§ 7402, 7407, and 7408.

4.    Venue is proper in this Court under 28 U.S.C. § 1391(b)(1) because the Defendants reside in this district and all or a substantial portion of the activities occurred within this district.

## Defendants

5.    Markey Granberry resides in Germantown, Tennessee. Granberry is an owner of Mo' Money Taxes, MoneyCo USA LLC, Marquis Taxes, and Caymau Service Bureau LLC. Granberry also receives one-third of the profits from Southern King Taxes.

2

6.      Derrick Robinson, who is Granberry's cousin, resides in Memphis, Tennessee. Robinson is an owner of Mo' Money Taxes, Marquis Taxes, and Caymau Service Bureau LLC. Robinson also receives one-third of the profits from Southern King Taxes.

7.      Eumora Reese resides in Memphis, Tennessee. Reese is an employee of Mo' Money Taxes and MoneyCo USA LLC, and managed the Mo' Money Taxes location at 5090 Millbranch Road, Memphis, Tennessee.  Reese has a business license for the "service bureau" located at 5090 Millbranch Road.  Reese also has a business license for the Southern King Taxes located at 3711 Hickory Hill in Memphis.

8.      Mo' Money Taxes (also known as Mo' Money Tax Service, LLC) is a partnership owned equally by Granberry and Robinson and was founded around 1995. At its peak, the Mo' Money Taxes chain operated as many as 300 tax return preparation offices in 18 states, according to its website. Mo' Money Taxes claims to have "processed approximately 30,000 tax returns" in 2008. In 2013, Mo' Money Taxes locations now operate under new names, including Southern King Taxes and Marquis Taxes. Mo' Money Taxes' main office is located at 5090 Millbranch Road, Memphis, Tennessee.

9.      MoneyCo USA LLC ("MoneyCo") is a limited liability company organized in the State of Tennessee.  Granberry formed MoneyCo in 2010.  Beginning in 2011, many Mo' Money Taxes locations operated under the name MoneyCo USA.  MoneyCo's main office is located at 5090 Millbranch Road, Memphis, Tennessee.

10.     Caymau Service Bureau LLC ("Caymau") is a limited liability company organized in the State of Tennessee.  Granberry and Robinson formed Caymau in 2010. Caymau's main office is located at 5090 Millbranch Road, Memphis, Tennessee.

11.     Marquis Taxes is a tax return preparation business created by Granberry and Robinson in 2012.  Marquis Taxes does business at 3711 Hickory Hill in Memphis, Tennessee, which was previously a Mo' Money Taxes location.  This address is also the address of record on Reese's business license for Southern King Taxes.

12.     Southern King Taxes is a tax return preparation business operated by Reese, Granberry, Robinson, and others. Southern King Taxes' main office is located at 5090 Millbranch Road, Memphis, Tennessee.

### Defendants' Business Structure

13.     Mo' Money Taxes began as a tax return preparation business in Memphis operated by Granberry and Robinson.  Eventually, Granberry and Robinson expanded the business, and began employing friends and family to manage additional stores in the Memphis area.  Many of these friends and family members continue to manage locations in the Memphis area under the direction of Granberry and Robinson.  Managers are paid a fixed amount per week and, at the end of the tax filing season, paid a percentage of the store's profits.

14.     Granberry and Robinson began licensing Mo' Money Taxes offices outside of Memphis and, ultimately, throughout the country.  According to Mo' Money Taxes' Licensed Affiliate Information and Application, Granberry and Robinson "are very hands-on";  Granberry "oversees the licensing, training, human resources and area development divisions" of Mo' Money Taxes, while Robinson "oversees the technical support and marketing divisions."

15.     Mo' Money Taxes uses promises of wealth to attract licensees, soliciting people who "have a positive attitude, a great outlook on life, and want to earn a comfortable living," based on the boast that the "majority of our licensees enjoy great success, grossing an average of $100,000 sales annually."

4

16.     Mo' Money Taxes claims that "licensed affiliate status is similar to a franchisee but without the extensive rules and stipulations that generally apply," and the "licensing fee is also significantly lower than those of a franchise."  In fact, the only requirement to be a licensee is the payment of a licensing fee and agreement to follow the terms set by Granberry and Robinson.  There is no requirement that the licensee have any tax return preparation experience or training, knowledge of federal tax laws or accounting, or minimum education.  There is no background check performed to determine if the licensee has a criminal history or any other characteristic that calls into question their qualification or fitness to prepare tax returns.

17.     Similarly, the tax return preparers that Mo' Money Taxes licensees, in turn, employ are not required to have any tax return preparation experience or training, knowledge of federal tax laws or accounting, or minimum education.  Upon questioning by IRS agents, most licensees and preparers did not understand the requirements for claiming dependents, head-of-household filing status, the Earned Income Tax Credit, or meeting the "due diligence" requirements set forth in 26 C.F.R. § 1.6995-2 (2011). Many licensees and preparers do not feel qualified to prepare their personal tax returns.  For example, licensee Toney Fields told the IRS that he does not prepare his own tax returns because he is "not that good," and has his personal tax return prepared by a tax return preparer not affiliated with Mo' Money Taxes.

18.     Licensees sign (or are supposed to sign) a license agreement with Mo' Money Taxes that defines the relationship between the parties.  The license agreement defines the tax season as December 27 through April 16.  Some Mo' Money Stores open as early as November. Notably, Forms W-2 are not available to employees before the end of the calendar tax year, and tax returns cannot be filed before January of the processing year.  Licensees are also provided

5

with lease agreements to use when leasing retail space (Granberry is involved in selecting the location).

19.     The license agreement requires that the "Licensee must only use software, banks, and service bureau of Licensor's choice."  Licensees are also required to use the Mo' Money Taxes advertising created by Granberry and Robinson. Estimated first year costs for licensees include a $12,500 licensing fee, $3,000 for advertising, $5,000-$7,000 for equipment and furniture, $1,000-$3,000 for signage, $500-$1,000 for insurance, and $5,000+ for utilities and other miscellaneous expenses, with rent and payroll expenses varying.  The license fee, paid once every three years, is $10,000, with an additional $2,500 fee for each new store.

20.     Prior to 2011, licensees paid their license fee to Mo' Money Taxes.  Beginning in 2011, licensees paid their license fee to Caymau.  Licensees must also pay to Mo' Money Taxes or MoneyCo (depending on the year) a per-return "franchise fee" that varies from $39 to $59 for the "processing" of each federal and state tax return, and to Caymau Service Bureau a per-customer "service bureau fee" of $25.  Licensees were also required to pay a $5 fee for returns that were filed without a loan product, in all states except Arkansas, where Mo' Money Taxes has run afoul of state consumer protection laws that bar such a practice.

21.     In 2010, Granberry formed MoneyCo to more clearly divide the business between himself and Robinson, and MoneyCo replaced Mo' Money Taxes on the license agreements.  In addition to tax return preparation, MoneyCo offered other financial products, including mortgages, auto financing, credit, and insurance.  MoneyCo's website emphasizes that it was formerly known as Mo' Money Taxes. However, MoneyCo did not have the brand recognition of Mo' Money Taxes and customers were confused by the name change.  Moreover, tax return preparation continued to provide the vast majority of MoneyCo's business.  As a result, in 2011,

6

licensees were given the choice of continuing to do business as MoneyCo or reverting to the Mo'
Money Taxes name.

22.     Following bad publicity surrounding Mo' Money Taxes in 2012 (arising from
customer allegations that Mo' Money Taxes did not provide the customers' tax refunds within a
reasonable amount of time, if at all), the decision was made by Granberry and Robinson to
change the name of the business.  In 2012, Granberry and Robinson announced that they would
be opening a new business called Marquis Taxes.  Managers of Mo' Money Taxes locations in
Memphis were given the opportunity to "own" the store that they managed, under the new name
Southern King Taxes.  In reality, Granberry and Robinson still control the Southern King Taxes
stores and each receives one-third of the profits from each store.

23.     Caymau continues to receive fees from Southern King and other recently-renamed
Mo' Money Taxes businesses.  Since the creation of Caymau in 2010, the computer software
used to prepare tax returns at Mo' Money Taxes is purchased through Caymau.  Caymau
receives a "service bureau" fee in the amount of $25 for every return prepared by Mo' Money
Taxes, MoneyCo, Southern King Taxes, and Marquis Taxes.  The service bureau fee is simply
more revenue to Granberry and Robinson generated from every tax return prepared.

**Mo' Money Taxes "Training" and Lack of Quality Control**

24.     Mo' Money Taxes claims to offer "a turn-key program complete with computer
training, technical support, and marketing. After almost a decade in the business we know what
you need to be successful."  Mo' Money Taxes assures potential licensees that "we will be with
you every step of the way," with "24/7 access to our knowledgeable staff and much more."  This
purportedly includes "in-depth training concerning tax preparation, staffing office procedures,
effective management and how to get the best out of your employees" to "all new licensed

7

affiliates," designed "to ensure that your staff has a thorough understanding of their responsibilities."  Purportedly, Mo' Money Taxes "tax preparers are required to attend a two-week tax course where they will receive extensive knowledge and training" in data entry, types of forms and usage (i.e. 1040A, 1040 EZ, childcare, education credits, earned income credit, itemization, Schedule C, 1099 Misc., state income taxes, and fee entries), data transmission, and customer service.

     25.    Reese and Granberry train Mo' Money Taxes managers, licensees, and preparers annually in Memphis.  The training usually lasts no more than a week, and predominantly focuses on how to use the software to prepare tax returns and how to fill out the paperwork for refund anticipation loans and similar loan products, rather than tax law. Instruction is also provided on how to prepare tax returns using a customer's end-of-year pay stub in lieu of a Form W-2, marketing, and processing customer applications for financial products offered by Mo' Money Taxes, such as refund anticipation loans.  The training exercises in the Mo' Money Taxes training manual focus on how to input information into the computer in order to get the refund amount that would be generated if the trainee input the exercise's example customer's personal and financial information on the proper lines of the tax return or forms attached to the tax return.

     26.    Reese and Granberry fail, however, to teach Mo' Money Taxes managers, licensees, and preparers crucial elements related to basic tax return preparation.  For example, they provide no genuine instruction on the Earned Income Tax Credit due diligence requirements, procedures for detecting fraudulent Forms W-2, and the methods to question customers who provide suspicious, false or fraudulent information.   The training also fails to give tax return preparers the knowledge or experience to properly and consistently complete basic income tax returns—let alone more complicated tax returns, such as those requiring

8

Schedules A and C.  This inadequate training contributes to the preparation of inaccurate, incomplete, and false tax returns.

27.     Interestingly, the Mo' Money Taxes/MoneyCo training manual and policies and procedures manual were created by employee Todd Johnson, at Granberry's direction, only after the State of Arkansas filed a complaint against Mo' Money Taxes in 2010 alleging that Mo' Money Taxes' "improper loan fees" and failure to disclose such fees violated the state's Refund Anticipation Loan Act and Deceptive Trade Practices Act relating.  Granberry needed a policies and procedures manual to provide to Arkansas to show that Mo' Money Taxes purportedly had procedures in place related to their refund anticipation loan programs to ensure compliance with state law.  The policies and procedures manual lists documents that a customer is purportedly required to provide to have their tax return prepared, including government-issued identification, social security cards for the customer and any dependents, forms W-2, Forms 1099, and documentation supporting Schedule A deductions and Schedule C income and expenses. The manual also outlines the purported steps that must be followed by the tax return preparer when preparing the customer's tax return, providing the customer with a "tax estimate," filing the tax return, printing and providing customers with their refund anticipation loan checks, and maintaining customer files for purported "later review and audit by office manger [sic] and inspectors."  The majority of the policies and procedures manual is dedicated to company employment policies, such as hiring, salary, and benefits.  The policies and procedures manual has no substantive discussion of tax law, such as the requirements to claim credits or deductions, or instructions on how to prepare tax returns.

28.     There is no quality control or oversight of the licensees and the Mo' Money Taxes stores.  If a tax return preparer at a Mo' Money Taxes store has a question, he or she goes to the

9

manager of that store.  Managers do not conduct quality control reviews, but simply allow their employees to prepare tax returns as they see fit with little or no training or supervision.

29.     Granberry and Robinson commonly communicate with Mo' Money Taxes managers, licensees, and preparers through conference calls and e-mails, rather than in-person, because of the number and location of Mo' Money Taxes stores throughout the country.

### Defendants' Fraudulent Activity

30.     The Defendants, and others acting with them and at their direction, have created and maintain a business environment at Mo' Money Taxes (and its progeny, including Southern King Taxes and Marquis Taxes) that expressly promotes and encourages the preparation of false and fraudulent federal income tax returns.  New preparers are trained to prepare false and fraudulent tax returns for the purpose of significantly and illegally enlarging the Defendants' profits, and resulting in losses to the U.S. Treasury.  The Defendants also direct managers, licensees, and preparers to engage in other illegal conduct, such as the preparation of fabricated Forms W-2.

31.     Many of the Defendants' customers are unsophisticated people with low incomes. Many of them have no knowledge that Mo' Money Taxes prepares and files fraudulent tax returns on their behalf.  For others, Mo' Money Taxes preparers—with the Defendants' consent and urging—encourage customers to participate in the tax fraud by misleading them about the law and promising them thousands of dollars of (illegal) refunds to coerce them to pay Mo' Money Taxes to prepare their tax returns.  The Defendants benefit by receiving a significant portion of their customers' fraudulently obtained refunds, which they retain as purported fees.

32.     The Defendants instruct, direct, assist, advise, encourage, and cause their managers, licensees, and preparers to engage in illegal practices which, not coincidentally, focus

on many of the very claims and credits on which Mo' Money Taxes claims to provide training, including, but not limited to:

    a.    Making fraudulent claims for the Earned Income Tax Credit;

    b.    Circumventing due diligence requirements in order to fraudulently maximize the Earned Income Tax Credit; and

    c.    Improperly claiming false filing status;

    d.    Falsely claiming education credits to which their customers are not entitled;

    e.    Improperly preparing returns based on paystubs rather than Forms W-2;

    f.    Preparing fabricated Forms W-2;

    g.    Improperly sharing and abusing Electronic Filing Identification Numbers;

    h.    Filing federal income tax returns without the taxpayer's consent;

    i.    False and deceptive loan products;

    j.    Charging deceptive and unconscionable fees.

33.    Following the Defendants' instruction, direction, assistance, and encouragement, their managers, licensees, and preparers prepare and file false and fraudulent federal tax returns that significantly and illegally increase the Defendants' profits, result in losses to the U.S. Treasury, and cause financial harm to their customers, including as detailed below.

**Earned Income Tax Credit Fraud and Failure to Comply with Due Diligence Requirements**

34.    The Defendants and their managers, licensees, and preparers prepare tax returns that include fraudulent claims for the Earned Income Tax Credit often based on bogus dependents, fabricated business income and expenses, and false filing status.

35.    The Earned Income Tax Credit (EITC) is a refundable tax credit available to certain low-income working people.  The amount of the credit is based on the taxpayer's income,

filing status, and claimed number of dependents.  The requirements for claiming the EITC are set forth in I.R.C. § 32 and the accompanying Treasury Regulations.

36.     Because the EITC is a refundable credit, claiming an EITC can, in certain circumstances, reduce a taxpayer's federal tax liability below zero, entitling the taxpayer to a payment from the U.S. Treasury.

37.     Due to the method used to calculate the EITC, an individual can claim a larger EITC by claiming multiple dependents and, for certain income ranges, individuals with higher earned income are entitled to a larger credit than those with lower earned income.  The amount of the credit increases as income increases between $1 and $12,550, and decreases as income increases beyond $16,400.  Some tax preparers who manipulate reported income to maximize the EITC refer to this range of earned income corresponding to a maximum EITC as the "sweet spot."  For tax year 2010, the maximum EITC was $5,666 and was available to eligible individuals with three dependent children who earned income between $12,550 and $16,400.

38.     Because of the way the EITC is calculated, reporting more income, up to a certain point, allows customers to receive a larger refundable credit.  Similarly, claiming losses to offset higher income to decrease the total reported income and to fall within the "sweet spot" allows customers to claim a larger refundable credit.

39.     The Defendants are falsifying information to claim the maximum EITC for their customers. Unscrupulous tax return preparers like the Defendants exploit the rules by claiming on their customers' returns bogus dependents and/or by reporting phony Schedule C businesses and income.  In order to bring the customer's reported earned income within the "sweet spot" for the EITC, and depending on a customer's actual income, the Defendants inflate or fabricate

Schedule C income to fraudulently increase reported earned income, or claim bogus Schedule C deductions to fraudulently decrease reported earned income.

40.     Because of the potential for abuse in claiming the EITC, Congress has authorized the Secretary of the Treasury to impose "due diligence" requirements on federal tax return preparers claiming the EITC for their customers.  These "due diligence" requirements obligate the tax return preparer to make "reasonable inquiries" to ensure the customer is legitimately entitled to the EITC.  The tax return preparer may not "ignore the implications of information furnished to, or known by, the tax return preparer, and must make reasonable inquiries if the information furnished to the tax return preparer appears to be incorrect, inconsistent, or incomplete."  *See* 26 C.F.R. § 1.6695-2 (2011).  Tax return preparers must also document their compliance with these requirements and keep that documentation for three years.  *Id*.

41.      To document compliance with the due diligence requirements, tax return preparers must complete either the "Paid Preparer's Earned Income Credit Checklist" (Form 8867) and record and maintain other documentation verifying customer eligibility for the EITC.

42.     The Defendants and their managers, licensees, and preparers fail to comply with the due diligence requirements.  Customers are given several forms to complete, including: a taxpayer information sheet, which requests basic information such as name, address, social security number, filing status, and dependents; and a document titled "Alternate Eligibility Record (Due Diligence)," which is a "yes or no" checklist of questions regarding eligibility for head of household filing status, the earned income credit, and claiming foster children.  Typically these eligibility checklists are not fully completed by the customers, if they are marked at all. Often the customer does not check all of the necessary boxes for head of household status or

earned income credit.  In many instances the Mo' Money Taxes preparer disregards the customer's responses on the checklist entirely.

43.     The Defendants and their managers, licensees, and preparers completely disregard these two forms, which apparently serve no other purpose than to give the illusion – should the IRS conduct an investigation to determine whether the "due diligence" requirements are being followed – that Mo' Money Taxes is questioning its customers and complying with the requirement that it document its customers' eligibility for the EITC.  Frequently the customers do not complete or sign these forms, and the blank forms are still maintained in the customers' files, even though such blank forms serve no purpose and do not meet the due diligence requirements.

44.     The IRS has conducted at least four investigations of Mo' Money Taxes stores to determine whether their preparers complied with the due diligence requirements.  Of those four investigations, three resulted in a total amount of $29,800 in penalties assessed under 26 U.S.C. § 6695(g) for 298 separate failures to comply with the due diligence requirements.

45.     The Defendants' conduct shows an intentional disregard for the tax laws and in particular for the due diligence requirements, and demonstrates their unwillingness to comply with the requirements.  Not only do the Defendants fail to adhere to the due diligence requirements, but they and those acting at their direction are falsifying information in order to maximize the EITC for their customers.

### Intentionally Claiming an Improper Filing Status

46.      The Defendants and their managers, licensees, and preparers also routinely prepare tax returns reporting false filing status.  Specifically, head-of-household filing status is claimed on customers' tax returns to increase the amount of the customers' standard deduction,

14

even though Mo' Money Taxes is aware that the customer does not qualify for head-of-household status.  For customers such as Phillip Fields, who had been married for 21 years at the time he had his 2010 return prepared by Mo' Money Taxes in Stone Mountain, Georgia, the decision to falsely claim head-of-household filing status on his return "was made by Mo' Money Taxes."

47.     The Defendants and their managers, licensees, and preparers frequently file separate returns for married couples who are not living apart, improperly using the "head-of-household" or "single" filing status, both of which are unavailable to married couples living together.  Often, this is an attempt to increase the claimed EITC because, for example, a couple with at least two children who, together, would otherwise receive a single EITC refund of $5,000 by properly claiming "married, filing jointly," may instead each receive a refund of $3,000 or more, by both falsely claiming head-of-household or single status and each claiming at least one dependent.  Additionally, single filers are often instructed to claim a dependent that does not actually qualify as a dependent, and then claim head-of-household filing status to increase their refund through both the false filing status and fraudulent EITC claim based on the bogus dependent.

48.     For example, husband and wife Marcus and Domiaique Davis had their 2011 income tax returns prepared at a Mo' Money Taxes in Memphis on January 10, 2012.  Rather than file a correct return claiming "married, filing jointly" status, or two returns correctly claiming "married, filing separately" status, two separate returns were prepared, which both falsely claimed head-of-household status.  The preparer knew that this was false, as the returns for the Davises reported the same address (a single-family home), and there can be only one head-of-household.  The preparer allocated purported dependents – Domiaique's return reported

15

the Davises' three children, while Marcus' reported his mother and niece – to fraudulently claim and maximize the EITC on each return.  Additionally, the Davises' tax returns were improperly prepared using employer pay stubs, and the preparer fabricated a bogus Form W-2.

49.     Similarly, Eumora Reese prepared a 2009 federal income tax return for customer Robin Walker of Memphis.  Walker did not check any of the boxes on the Alternative Eligibility Record. On the customer information sheet, Walker circled "single" filing status and listed as a dependent a person whose relationship Walker listed as "good friend," which is not a qualifying relationship for head-of-household or the EITC.  However, Reese reported the "good friend" as a dependent on Walker's tax return, and falsely claimed head-of-household filing status and the EITC, based on this non-qualifying purported dependent.  This fraudulently increased Walker's tax refund. Additionally, even though Walker only listed this "good friend" as a dependent on the customer information sheet, Reese added another, bogus dependent to the return, and used this other dependent – a minor – to claim a Child Tax Credit.

50.     Customers' improper filing status on returns that the Defendants and their managers, licensees, and preparers prepare is frequently belied by the Alternate Eligibility Record form completed by the customers, on which they have indicated that they do not qualify for head-of-household filing status.  However, on the tax return, the Mo' Money Taxes preparer falsely claims head-of-household filing status, in direct contravention to the information provided by the customer.  As it does with respect to customers' EITC eligibility, Mo' Money Taxes completely disregards these forms when determining the customer's filing status.

51.     Defendant Eumora Reese prepared a 2009 federal income tax return for customer Annaya Tate Porterfield of Memphis.  Porterfield marked on the Alternative Eligibility Record (dated December 26, 2009, before the end of the tax year) that she was married and did not pay

more than half of the costs of her household during the tax year. Porterfield circled "married" filing status on the customer information sheet, but that was crossed out and "head-of-household" was circled.  On Porterfield's tax return, Reese falsely reported the filing status as head-of-household.

52.     A tax-return preparer at the Mo' Money Taxes location on Winchester Road in Memphis prepared the 2009 federal income tax return for customer Rickie Barnes.  Barnes listed his wife, Leisa, on the information sheet, and left blank the boxes on the Alternative Eligibility Record pertaining to marital status.  But on the tax return, the preparer falsely reported Barnes' filing status as "head-of-household" and omitted his spouse, while claiming the Barneses' two children as dependents.  The preparer also prepared Leisa Barnes' 2009 federal income tax return, and falsely claimed her filing status as "single."

**Bogus Education Credits**

53.     Another common practice at Mo' Money Taxes stores involves fabricating education expenses and falsely claiming refundable education credits, including the American Opportunity Education Credit, on customers' federal income tax returns.  Unlike many tax credits, a refundable tax credit entitles qualifying taxpayers to receive refunds even if they have no tax liability.  The Defendants commonly falsely claim education credits on the tax returns of customers who did not attend college and had no qualifying education expenses, in order to fraudulently reduce their customers' taxable income and generate a larger bogus refund.

54.     For example, Mo' Money Taxes manager Shandon Allen prepared the 2011 federal income tax return of Lashunda Rainey, on which Allen falsely claimed an American Opportunity Education Credit in the amount of $1,000.  Allen falsely claimed on the Form 8863, "Education Credits (American Opportunity and Lifetime Learning Credits)," attached to the

17

return that Rainey had $4,000 in qualifying education expenses for a student identified as

Rainey's sister.  In actuality, IRS records show that neither Rainey nor her sister had any

qualifying education expenses in 2011, which the educational institution would have reported to

the IRS on a Form 1098-T.

**Improperly Preparing and Filing Returns based on Pay Stubs and Fabricating Forms W-2**

55.     The Defendants and their managers, licensees, and preparers also prepare and file

federal income tax returns using customers' end-of-year pay stubs, which commonly involves

creating bogus Forms W-2 based on the amounts reported on those pay stubs, and then filing

their customers' tax returns without valid Forms W-2.  In other instances, an IRS Form 4852,

"Substitute for Form W-2," is attached to the customer's return, which falsely claims that the

employer did not timely issue a Form W-2.  In reality, the return is prepared before the end of the

tax year and/or before an employer even has the ability to issue a Form W-2 for that year.

56.     Federal tax returns for wage earners must be prepared using Forms W-2. Using

pay stubs to prepare and file tax returns is improper and violates IRS rules. Moreover, end-of-

year pay stubs frequently omit income and distributions that are shown on employer-issued

Forms W-2.  Thus, preparing and filing federal income tax returns based on information from

end-of-year pay stubs inevitably results in errors and omissions on federal tax returns, which

necessarily interferes with the administration and enforcement of the internal revenue laws.

The Defendants know that using paystubs to prepare and file returns violates the law because in

order to participate in the IRS's electronic filing program, all electronic filers, including the

Defendants, must acknowledge that they will comply with the IRS's requirements, which

expressly prohibit filing returns prepared with pay stubs and without genuine Forms W-2.  The

Defendants insist that pay stubs are used only to prepare tax returns that are shown to customers

18

as "estimates," and that the customers must later return with a Form W-2 issued by an employer

before the tax return will actually be filed.  In reality, the "estimated" returns are simply filed.

57.     Mo' Money Taxes stores open on or before December 27 of each year, before the

end of the tax year, before customers know how much income they earned and taxes they owe

for the year, and before employers are able to issue Forms W-2 to their employees.

58.     By preparing tax returns before the end of the tax year, Mo' Money Taxes

unfairly solicits business before its competitors.  Customer Nicole Gleese of Jackson,

Mississippi, for example, had her tax return prepared at Mo' Money Taxes "because they were

the only ones doing taxes with the last checkstub."  This also enables Mo' Money Taxes to take

advantage of customers who desired a refund anticipation loan – particularly around Christmas

time – and charge higher fees and/or rates for their loan products, because preparers who follow

the law would not prepare returns before the end of the tax year and using pay stubs.

59.     The Defendants' customers fill out a taxpayer personal information sheet, which

identifies the customer's name, address, social security number, and dependent information, as

well as MoneyCo company forms, such as a "Product Disclosure" form for the company's

refund anticipation loan program.  The customers often complete these forms in December or

early January, and because their employers have not yet issued Forms W-2, the Defendants use

the customers' most recent pay stub to prepare a tax return and create a fake Form W-2.

60.     To facilitate the improper preparation of tax returns using pay stubs, the

Defendants maintain binders of information to enable their employees to prepare false Forms

W-2. These binders are located at Mo' Money Taxes' main corporate office at 5090 Millbranch

Road in Memphis.  These binders contained information on thousands of employers, including

the employer's name, address, and, most importantly, the Employer Identification Number

("EIN") reported on Forms W-2, which does not typically appear on pay stubs and is used by the IRS to identify a business entity. The Millbranch office is known as the "call center" because managers or licensees call this office with any questions about preparing returns or the tax preparation software, including information necessary to fabricate a bogus Form W-2. In other instances, preparers call or email other Mo' Money Taxes locations seeking EINs.

61.     For example, Mo' Money Taxes preparer Trumekia Shaw prepared the 2011 federal income tax return of customer Karema Bogan of Nashville, Tennessee, an employee at a Burger King restaurant. The return is signed and dated by Bogan and Shaw on December 16, 2011, more than two weeks before the end of the 2011 tax year, long before any Form W-2 for 2011 could be issued by Burger King. Despite not having a Form W-2, which could include additional income Bogan received in December 2011, Shaw reported that Bogan received $20,619 in wages. IRS records derived from the Form W-2 that Burger King submitted show that Bogan actually received $21,181 in wages from Burger King in 2011.

62.     Mo' Money Taxes manager Shandon Allen prepared a 2011 federal income tax return of customer Tawanna Flowers, to which Allen appended a Form 4852, "Substitute for Form W-2." The Form 4852 was signed by Allen and dated December 23, 2011, before the end of the tax year, and before an employer could issue a Form W-2. The Form 4852 states that the wages reported on the Form were determined by using a "check stub."

63.     Allen also prepared a 2011 federal income tax return for customer Ray Hunter on December 23, 2011, to which Allen appended a Form 4852 claiming that the employer did not have the Form W-2 "before the customer filed" and a check stub was used to prepare that return. Additionally, Allen created a bogus Form W-2 purportedly issued to Hunter by First Assembly of God. The bogus Form W-2 reported $29,512 dollars in wages and $5,209 in federal income

tax withheld.  IRS records from the actual employer-issued Form W-2 from First Assembly of God show that the correct wages Hunter received from First Assembly of God in 2011 was $29,951, and the actual amount of federal income tax withheld was $3,593.  By falsely reporting that Hunter had $5,209 in federal income taxes withheld – more than $1,500 than the actual withholdings – Allen claimed a larger federal income tax refund than Hunter was entitled to, due to the inflated income tax withholdings reported on the bogus Form W-2 and Hunter's tax return.

64.    Beginning in 2011 or 2012, Mo' Money Taxes manager Tabitha Tunstall instructed preparers who worked in her office to begin preparing Forms 4852 when preparing tax returns based on customers' paystubs.  Tunstall also directed her employees to destroy the Form 4852 if the customer later returned with a real Form W-2. If a customer did return with a Form W-2, and the wages reported on that form did not match the wages on the pay stub, Tunstall's employees were required to inform the customer that an amended tax return would need to be prepared and filed.

65.    The Defendants and their managers, licensees, and preparers also fabricate bogus Forms W-2 for customers based on the customer's most recent pay stub.  A taxpayer may have more than one Form W-2 if they have more than one job. Each employer will issue its own Form W-2 to the taxpayer.  The Defendants often create two bogus Forms W-2, purportedly issued by two different employers, on a single sheet of paper.  To conceal this fraudulent conduct, the Defendants then separate the two fabricated Forms W-2 by cutting along a dotted line.  Placing the two Forms W-2 together, it is apparent that the two forms were cut from the same sheet of paper.  In some instances, the two Forms W-2 - again, purportedly issued by two separate and distinct employers - are not even separated and are retained in the customer's file as a single-page document. Using paystubs to create bogus Forms W-2s that frequently report false EINs

and false income amounts constitutes outright fraud and is a serious obstruction of tax administration.

66.     For example, Mo' Money Taxes licensee Toney Fields, who operated a Mo' Money Taxes store in Nashville, Tennessee, fabricated Forms W-2 in connection with his preparation of the 2010 federal income tax return of customer Timothy Davis.  Davis filled out a taxpayer information sheet and a MoneyCo Product Disclosure form on December 27, 2010. Fields prepared a tax return dated January 2, 2011.  Fields fabricated two bogus Forms W-2, purportedly issued to Davis by BF Nashville Inc., of Nashville, Tennessee, and Shoneys, of Madison, Tennessee, on a single sheet of paper, based on Davis's pay stubs from these companies.  BF Nashville Inc. and Shoneys obviously would not issue Forms W-2 together on a single sheet of paper.  Fields then cut the sheet of paper in two to give the false appearance that these two Forms W-2 were issued separately.  The bogus Form W-2 from Shoneys reported "4262" dollars in wages.  IRS records from the actual Shoneys -issued Form W-2 show that the correct wages Davis received from Shoneys in 2010 was $4,317.  The EINs that Fields reported on the bogus Forms W-2 for BF Nashville Inc. and Shoneys were false.

67.     Similarly, Mo' Money Taxes employee Trumekia Shaw fabricates Forms W-2 that often do not include the customer's correct employer.  For example, Shaw prepared the 2010 federal income tax return of customer Linda Rhodes of Nashville, Tennessee.  Shaw fabricated two Forms W-2 on a single sheet of paper, both listing "Exxon Mobile" (misspelled with an "e" on the end) as the employer, and wages of "7800" and "7049" on the two forms.  Rhodes actually received income in 2010 from Exxon Mobil Business Support Center and from LF Nashville Acquisition LLC.

68.     The Defendants and their managers, licensees, and preparers also suborned perjury by having their customers attest under penalty of perjury on the Form 1040 tax return and the related Forms 8879 IRS e-file Signature Authorization that the customers had reviewed their tax return and accompanying schedules and statements and, to the best of the customers' knowledge, those documents were "true, correct, and complete," when in fact that was not possible because the customers did not yet have legitimate Forms W-2 and the tax return was, by its nature, not true and complete because it was based on pay stubs and fabricated Forms W-2.

69.     The Defendants are aware that their managers, licensees, and preparers routinely and intentionally also fabricate other documents that are maintained in their customer files to create a paper trail to conceal their fraudulent practices from the IRS after they have already transmitted the customer's tax return to the IRS.

70.     In addition to fabricating Forms W-2, the Defendants' managers, licensees, and preparers also falsely complete IRS Forms 8879, "IRS e-file Signature Authorization."  Return preparers must obtain this signed authorization from each customer before e-filing his or her federal tax return.  The preparer also must retain a copy of the signed authorization for three years.  In addition, the customer must sign the form within three days of submission to the IRS.  Because return preparers cannot e-file tax returns until mid-January—often weeks after Mo' Money Taxes has prepared paystub returns for their deceptive loan program—the Defendants' managers, licensees, and preparers frequently have their customers sign authorization forms when they bring in their paystubs, but falsely post-date the forms to make it look like they were signed within three days of the legal filing date.  As with fake Forms W-2, the purpose of fabricating and maintaining the bogus documents in files is to cover up the regular practice of

23

filing paystub returns without customer authorization and, thereby, avoid IRS fines or penalties should the IRS review customer files.

### Unauthorized Filing of Customers' Tax Returns and Identity Theft

71.     The Defendants and their managers, licensees, and preparers also prepare and file "estimated" tax returns without the taxpayer's knowledge or consent.  The Defendants tell customers that their use of paystubs to prepare tax returns is only for the purpose of giving their customer an estimate of what their tax refund will be if they have Mo' Money Taxes prepare their return.  However, the Defendants often file the "estimated" tax return without their customer's knowledge or consent.

72.     The Defendants cater to low-income taxpayers, many of whom are in need of money quickly.  Frequently these customers inquire about the company's various—but false and deceptive—loan products (discussed below), in the hope of securing an advance on an expected refund.  Other customers come in seeking to obtain an early estimate of their possible refund amount, prior to filing their tax return.  In both cases, the Defendants and their managers, licensees, and preparers instruct preparers to complete an "estimated" income tax return, purportedly to determine whether the customer qualifies for a refund anticipation loan or to give the customer an accurate estimate of their expected refund.  Customers sign the return and other tax forms authorizing the Defendants to file the return and are falsely told that the return will not be filed with the IRS until the customer returns with a Form W-2 issued by their employer.

73.     However, the Defendants and their managers, licensees, and preparers routinely and illegally file those estimated income tax returns, based on pay stubs, without customer authorization to "lock-in" prospective customers.  This practice effectively prevents the customer from later using one of Mo' Money Taxes' competitors to prepare and file a return, because a

taxpayer can file only one electronic return with the IRS per year.  It also gives the Defendants a competitive advantage over tax return preparers who obey the law and wait to prepare and file returns using Forms W-2.  Most importantly, the practice generates an inaccurate return and an unauthorized refund, impedes tax administration, and guarantees that the Defendants will receive their unconscionably high fees, which are paid directly from the customer's refund only after the return has been electronically filed.

74.     For example, at a House Judiciary Committee, Subcommittee on Crime, Terrorism, and Homeland Security, hearing held on June 28, 2012, Mo' Money Taxes customer Michael Robinson testified that a Mo' Money Taxes office in Norfolk, Virginia filed his tax return without his consent or knowledge.  Robinson testified that he took his paystubs to Mo' Money Taxes and was shown an estimated refund on the preparer's computer screen.  Robinson left, telling his wife and daughter that he did not trust Mo' Money Taxes.  Once Robinson received his Form W-2, he returned to his usual tax return preparer to have his return prepared. When that preparer attempted to file Robinson's return, it was rejected because Mo' Money Taxes had already filed a return for Robinson without authorization and received a refund check in Robinson's name, which was deposited in a Mo' Money Taxes bank account.

**Misuse of Electronic Filing Identification Numbers**

75.     Granberry, Robinson, and Reese all previously prepared tax returns at Mo' Money Taxes locations.  However, in 2011 and 2012, they did not prepare tax returns.

76.     Mo' Money Taxes management and licensees serve as the Electronic Return Originator ("ERO") for their store.  ERO is an Internal Revenue Service designation for the person or entity that electronically submits tax returns on behalf of customers.  Before a person may prepare and electronically transmit tax returns for customers, he or she must obtain

authorization from the IRS to become an authorized provider.  Every authorized provider must

apply for and receive an Electronic Filer Identification Number ("EFIN") from the IRS.  The

EFIN is a unique number that clearly identifies the authorized provider and the location where

the return was prepared.  The issuance and use of EFINs allows the IRS to control who provides

e-filing services to the public, and allows the IRS to monitor, and hold accountable, those who

electronically file taxpayers' returns.   EROs are identified by their registered EFIN and are

responsible for preparing and filing with each tax return an IRS Form 8879, "IRS e-file Signature

Authorization."  Form 8879 is a signature authorization for an e-filed return filed by an ERO on

behalf of a customer.

77.     IRS Publication 1345 requires that an ERO "be diligent in recognizing fraud and

abuse, reporting it to the IRS and preventing it when possible."  As noted above, Mo' Money

Taxes managers conduct no meaningful quality control or oversight over the tax return preparers

in their Mo' Money Taxes stores, much less act diligently to prevent the fraud and abuse that is

undertaken with respect to the preparation of customers' tax returns.  IRS Publication 1345 also

mandates that "EROs must not electronically file individual income tax returns prior to receiving

Forms W-2, W-2G or 1099-R."

78.     The IRS has conducted 75 separate investigations of potential abuse or misuse of

EFINs by Mo' Money Taxes EROs, including Granberry, Robinson, and Reese.  Of those 75

investigations, 61 resulted in the EFIN being suspended or deactivated, the ERO receiving a

warning or written reprimand, or other corrective action being taken against the ERO.

79.     On or about March 17, 2009, the IRS informed Granberry and Robinson that it

was suspending an EFIN registered under their names to the Mo' Money Taxes office located on

Cleveland Street in Memphis, Tennessee.  This was one of multiple EFINs registered in their

names. The suspension was based, in part, on their preparation of returns based on paystubs, rather than Forms W-2, on 9 of the 20 customer returns reviewed.

80.     On or about February 19, 2010, the IRS informed Reese that it was suspending an EFIN registered under his name to the Mo' Money Taxes location on South Harper Road in Corinth, Mississippi.  The IRS informed Reese that this EFIN was suspended because a review of a sample of 27 tax returns e-filed from that office showed that 26 were prepared based on paystubs rather than Forms W-2.  As part of this investigation, during an interview on January 21, 2010 with the IRS, Reese told an IRS employee that it was all a game and you have to know how to play the game with the IRS. Like Granberry and Robinson, Reese had multiple EFINs.

81.     Unfortunately, the suspension of e-filing privileges is not an obstacle for the Defendants, who have multiple EFINs.  Additionally, the Defendants fraudulently use the names and information of employees, friends, and relatives to apply for and obtain new EFINs.

82.     In violation of IRS rules, the Defendants facilitate the misuse of EFINs among Mo' Money Taxes' managers, licensees, and preparers.  The Defendants interfere with these important tax administration and enforcement functions by illegally collecting, stockpiling, and distributing EFINs to unauthorized users.

83.     EFIN requirements mandate that authorized providers "must never share the numbers and passwords with others, including not transferring EFINs or ETINs to another entity . . . ."  All prospective authorized providers also must sign an EFIN application, under penalty of perjury, promising to comply with these requirements.

84.     In direct contravention of this mandate, and to circumvent the revocations of their own EFINs and conceal their involvement with their fraudulent tax return preparation, the Defendants obtained EFINs in the names of managers, licensees, preparers, and even relatives,

27

often without their knowledge.  The IRS has been able to identify at least 446 EFINs related to

Mo' Money Taxes, but believe there may be many more in the names of individuals who are not

known to be associated with the business.

85.    For example, one former Mo' Money Taxes manager, Jason Roberson, learned

during the 2011 filing season that EFINs were applied for in his name and using his personal

information, without his knowledge or permission.  Roberson believed that the only EFIN in his

name was that registered to his store in Atlanta, Georgia, when in fact there were 8 to 10 EFINs

in his name that he had not applied for.  Roberson learned that other Mo' Money Taxes

locations, including in Mississippi, were using these EFINs, which he did not apply for and

which could only have been applied for fraudulently by others at Mo' Money Taxes who had

access to his personal information.

**False and Deceptive Loan Products**

86.    According to Mo' Money Taxes' Licensed Affiliate Information and Application,

its "services include income tax preparations, electronic filing, 30-second and next day

anticipation loans."  The Defendants rely on these false and deceptive loan products, directed to

low-income customers who are in need of money quickly, to solicit business.   Central to the

Defendants' business model is offering these loan products that purportedly allow its customers

to quickly borrow money based on their anticipated tax refund.  Mo' Money Taxes was forced to

cease doing business in North Carolina after the state barred it from offering such predatory

loans.

87.    Mo' Money Taxes loan products include those commonly known as a Refund

Anticipation Loan ("RAL"), and also Mo' Money Taxes-specific loans, including their product

known as "Money on the Spot."  The Mo' Money Taxes three-year license agreement

28

specifically requires that for the licensee's agreement to be extended past June 15 following the third tax season, the "Licensee must also be producing a minimum of 500 refunded Ral tax returns in the third season of this term." Thus, licensees are required to sell this minimum number of RAL loan products by the third year or lose their licensee status. This incentivizes licensees to use deceptive methods to solicit customers for the loan products and, as described above, file tax returns without customers' knowledge or consent to meet their quota of loan products sold.

88.     Apart from being profitable in their own right, the false and deceptive loan products principally serve as an inducement for people to have their tax returns prepared and filed by the Defendants, so that the Defendants can charge them their unconscionably high fees. One loan program advertised by Mo' Money Taxes proclaimed, "UP TO $1800 IN 30 SECONDS OR UP TO $10,000 THE NEXT DAY." A MoneyCo USA advertisement stated, "GET YOUR REFUND ANTICIPATION LOAN THE NEXT DAY." As a further inducement, customers are falsely told that they will get a larger tax refund if they qualify for the loan products. As discussed below, most customers are either denied these loans outright, or receive loan amounts that are so small that they are subsumed by the accompanying service fees alone, before factoring in exorbitant tax preparation fees.

89.     For example, the Defendants began offering the "Money on the Spot" loan in December 2011and early January 2012, before the tax-filing season began. Ostensibly, this product was a loan intended to get customers in the door, with the hope that the customers would voluntarily have their tax returns filed when the filing season began and after they received their Forms W-2. In reality, this product provided cover to enable Mo' Money Taxes stores to prepare and file tax returns based on pay stubs rather than Forms W-2 and file without customer consent.

29

90.     Potential customers who applied for the "Money on the Spot" loan were required to sign a purported right of first refusal form created by the Defendants.  The potential customer was required to attest: "I understand that 1 of the qualifications of trying the Money on the Spot program is to allow MoMoneyTaxes the first right or [sic] refusal to prepare and electronically file my 2011 income taxes."  Based on this deceptive language, Mo' Money Taxes filed many customers' tax returns without their knowledge or express consent.  This also gave Mo' Money Taxes an unfair competitive advantage over tax return preparers who obeyed the law and waited to prepare and file returns using Forms W-2.

91.     Once the IRS begins accepting tax returns in mid-January, the Defendants market the RAL product.  The RAL is a recourse loan that uses the customer's expected tax refund as collateral.  RAL funds are advanced to a customer only after Mo' Money Taxes has prepared and filed the customer's federal tax return and the return has been accepted by the IRS.  The RAL is secured by and repaid directly from the proceeds of the customer's tax refund from the IRS.  The amount of the RAL is limited to the amount of the tax refund to be paid to the customer after the Defendants deduct their RAL fees, tax return preparation fees, and other bogus fees.  These fees are ultimately retained by the Defendants when the IRS deposits the customer's tax refund into a bank account established by the Defendants.

92.     The Defendants' loan products violate federal and state consumer protection laws. Several states have filed lawsuits or administrative complaints against Mo' Money Taxes, MoneyCo, Granberry, and Robinson for unscrupulous business practices, typically focusing on the Defendants' loan products and unconscionable fees.

**Illinois**

93.     In 2012, the State of Illinois sued Mo' Money Taxes, MoneyCo, Granberry and Robinson (among others) in state court alleging that Mo' Money Taxes offices in Chicago filed "unauthorized federal income tax returns" and "erroneous federal income tax returns" for its customers while "charging . . . undisclosed and exorbitant fees for tax preparation services" to those customers.

**Arkansas**

94.     In 2010, the State of Arkansas sued Mo' Money Taxes, MoneyCo, Granberry, and Robinson (among others) alleging that Mo' Money Taxes in Little Rock violated the state's Refund Anticipation Loan Act and Deceptive Trade Practices Act by charging "improper loan fees" and failing to disclose those high fees to customers.

**North Carolina**

95.      The Commissioner of Banks for the State of North Carolina brought an action against Mo' Money Taxes' North Carolina offices and Robinson, its president, for making refund anticipation loans without properly registering with the State. After consenting to pay a fine and registering with the State, in 2010 the Commissioner of Banks and Mo' Money reached a subsequent agreement where Mo' Money could no longer make refund anticipation loans in North Carolina after allegations arose that Mo' Money did not disclose its loan fees to customers.

**Deceptive and Unconscionable Fees**

96.     The Defendants charge unconscionably high fees to prepare tax returns and also charge added, deceptive fees.  In addition to the cost of having the tax return prepared, which may be several hundred dollars, charges include bank fees for refund anticipation loan products and bogus fees for "service bureau," processing, software, transmission, and "bank technology,"

31

which total over one hundred dollars. Additionally, an electronic filing fee of over $200 is charged. Because the Defendants' tax-return preparation businesses targets low-income taxpayers, the Defendants' unconscionably high fees frequently pose a significant financial hardship for their customers. The high fees also give Mo' Money Taxes a strong incentive to prepare and file fraudulent returns claiming excessive refunds.

97.     The Defendants also routinely fail to disclose all fees. Alternatively, they tell customers one amount for fees and then later increase the fees without the customer's knowledge or consent. Customers are often surprised to learn that the refund requested on their return is hundreds if not thousands of dollars more than the refund amount that they received after the fees were deducted.

98.     As with all of the fees that the Defendants charge, the service bureau fee is deducted directly from customers' refund checks. Tax refunds issued to customers are directed from the IRS to an account controlled by the Defendants or a third-party processor's bank account. The Defendants or the processor then deducts and transmits the fees owed to Mo' Money Taxes and Caymau for preparing the tax returns. The remaining refund amount is then directed to the customer, through direct deposit or check. The check issued to the customer makes no reference to the amount of fees deducted, which makes it easy for the Defendants to conceal, inflate and/or lie about their fees.

99.     Customers often complain that they did not know in advance that they would be charged exorbitant fees, and that they were told that their refund was much less than what was actually reported on their tax return. This has been a recurring theme of Better Business Bureau complaints and local news reports regarding Mo' Money Taxes locations across the country. For example, customer Nikkia Smith, whose return was prepared at the Mo' Money Taxes location

on Elvis Presley Boulevard in Memphis, was told that she would receive a refund of $6,341.05, when the refund claimed on her tax return was actually $7,297.

### Examples of the Widespread and Common Fraud at Mo' Money Taxes Locations

100.     Interviews with customers and examinations of their tax returns revealed that Mo' Money Taxes locations managed by different licensees separated by hundreds of miles engaged in fraudulent tax return preparation utilizing the same false claims, credits, and deductions.  This included interviews with hundreds of customers in several cities, including Memphis, Tennessee; Atlanta, Georgia; Richmond, Virginia; and Jackson, Mississippi.  The pervasiveness of this fraudulent tax return preparation at Mo' Money Taxes nationwide indicates that it is a company with systemic fraudulent practices designed to enrich the Defendants by collecting bogus fees for dishonest work, all at the expense of the United States and Mo' Money Taxes' sometimes unsuspecting customers.

101.     The following exemplifies the misconduct described above that is rampant at Mo' Money Taxes.

**Memphis, Tennessee**

102.     Customer Arzell Young's 2010 federal income tax was prepared at the Mo' Money Taxes (MoneyCo) location on Austin Peay Highway in Memphis.  The preparer falsely claimed an education credit on Young's return, when in fact Young did not attend college in 2010, did not incur any education expenses in 2010, did not tell the preparer that he had any education expenses, and did not give any documentation to the preparer to indicate that Young had any education expenses in 2010.  The preparer included the education credit on Young's return without his knowledge.

33

103.     Customer Guy Siggers' 2010 federal income tax return was prepared at the Mo'
Money Taxes (MoneyCo) location on Winchester Road in Memphis.  The preparer falsely
claimed an education credit on Siggers' return, when Siggers attended high school and worked
on his GED, did not incur any qualifying education expenses in 2010, did not tell the preparer
that he had any education expenses, and did not give any documentation to the preparer to
indicate that Siggers had any education expenses in 2010.  The preparer also falsely reported
$3,100 in child care expenses on Siggers' return, when Siggers had no such expenses and did not
inform the preparer of any such expenses.  The preparer included the education credit and child
care expenses on Siggers' return without his knowledge.

104.     Virgie Coleman's 2010 federal income tax return was prepared at the Mo' Money
Taxes (MoneyCo) located on Shelby Drive in Memphis.  Coleman gave the preparer a copy of
his end-of-year paystub to prepare the return.  The preparer falsely claimed an education credit
on Coleman's return, when Coleman did not attend college in 2010, did not incur any education
expenses in 2010, did not tell the preparer that he had any education expenses, and did not give
any documentation to the preparer to indicate that Coleman had any education expenses in 2010.
The preparer also falsely reported child care expenses on Coleman's return, when Coleman had
no such expenses and did not inform the preparer of any such expenses.  Coleman informed the
preparer that his sister took care of his granddaughter.  The preparer included the education
credit and child care expenses on Coleman's return without his knowledge.

105.     Customer Betty Rudd's 2010 federal income tax return was prepared at the Mo'
Money Taxes (MoneyCo) located on Lamar Avenue in Memphis.  The preparer falsely reported
on the Schedule C attached to the return that Rudd had a janitorial business.  Rudd had no such
business, and her only income came from her job with SDH Services.

34

106.    Customer Latasha Lott, whose 2010 federal income tax return was prepared at the Mo' Money Taxes (MoneyCo) location on Winchester Road in Memphis, was told by the preparer that if Lott paid an additional $75, the preparer could report someone else's dependent on her tax return to increase her tax refund.  Lott declined the offer.  The preparer also told Lott that she could get a larger refund is she claimed to be in college and had educational expenses in 2010.  Lott was not in college and did not have any educational expenses, but the preparer claimed an education credit on Lott's return without her knowledge or permission.

**Atlanta, Georgia**

107.    Customer Marcus Redding's 2010 federal income tax return was prepared at the Mo' Money Taxes (MoneyCo) located on Memorial Drive in Stone Mountain, Georgia, an Atlanta suburb.  Redding was employed by Waste Pro and BFI Waste Service in 2010, provided his Forms W-2 and a bank statement to the preparer, and did not have his own business.  However, the preparer falsely reported that Redding had an automotive repair business.  Redding did not tell the preparer that he had a business or any business expenses, did not provide any receipts for business expenses to the preparer, and was not asked any question about whether he operated a business.  The bogus Schedule C that the Mo' Money Taxes preparer attached to Redding's return reported that his purported automotive repair business had no income, but $25,610 in expenses, for a $25,610 loss that fraudulently reduced Redding's taxable income.

108.    Customer Almendo Osby had his 2010 federal income tax return prepared at the Mo' Money Taxes (MoneyCo) located on Delowe Drive in Atlanta.  The preparer claimed bogus education expenses on Osby's return.  Neither Osby nor his son – who was in high school – had qualifying education expenses.  The preparer did not ask Osby about any education expenses and

35

Osby did not tell the preparer about any education expenses.  Additionally, Mo' Money Taxes never provided Osby a copy of his completed tax returns, despite repeated requests from Osby.

109.    Customer Dramarcus Carmichael had his 2010 federal income tax return prepared at the Mo' Money Taxes (MoneyCo) location on Memorial Drive in Stone Mountain, Georgia. Even though Carmichael was married in 2010, the preparer falsely claimed head-of-household filing status on Carmichael's return.  The preparer falsely reported on the return that Carmichael operated a business, purportedly called "Dramarcus," which the return states was engaged in the business of "unclassified."  In fact, Carmichael is a full time employee of CSM Bakery Products. Carmichael did not tell the preparer that he owned any business or had any business expenses, even though the return reported bogus business expenses for car and truck expenses, mortgage insurance, insurance, taxes, cell phone expenses, clothing, ear muffs, knee pads, steel toe boots, and uniforms.  The Schedule C attached to Carmichael's return reported no business income but $30,419 in expenses, creating a bogus business loss in that amount that fraudulently reduced Carmichael's taxable income.  Carmichael simply gave the preparer a copy of his Form W-2, the social security numbers of Carmichael and his children, and a copy of his mortgage statement. Carmichael never got a copy of his completed tax return from Mo' Money Taxes and was unaware of the Schedule C reporting a phony business.

110.    Customer Mary Henderson's 2010 federal income tax return was prepared at the Mo' Money Taxes (MoneyCo) located on Memorial Drive in Stone Mountain, Georgia. Henderson provided the preparer with a copy of her Form W-2 from her employer, Target, receipts for uniforms for her job, a document regarding the sale of a house, and a bank statement showing interest received.  The preparer falsely reported on a Schedule C attached to Henderson's return that Henderson operated a business also described as "unclassified."

36

Henderson had no such business.  The Schedule C attached to Henderson's return reported no business income but $55,402 in expenses, creating a bogus business loss in that amount that fraudulently reduced Henderson's taxable income.  The preparer fabricated this business and the related expenses on Henderson's return, and did not review the completed return with Henderson.

**Richmond, Virginia**

111.    Customer Rita Hunt had her 2010 federal income tax return prepared at the Mo' Money Taxes (MoneyCo) located on Mechanicsville Turnpike in Richmond.  The preparer falsely told Hunt that she could claim her grandchildren as dependents, even though they did not live with Hunt.  The preparer also falsely claimed head-of-household filing status for Hunt, even though the preparer did not ask Hunt any questions about her qualifications to file as head-of-household status.  Hunt did not actually qualify for head-of-household status.  Additionally, the preparer falsely told Hunt that she could get more money if she qualified for the refund anticipation loan program that Mo' Money Taxes was offering.

112.    Stacy Brown's 2009, 2010, and 2011 federal income tax returns were prepared at Mo' Money Taxes (MoneyCo) on East Belt Boulevard in Richmond.  For each of these years, Brown's return was prepared using an end-of-year paystub, as Brown did not yet have a copy of her Form W-2 when her returns were prepared.

113.    Sherita Sutten's 2010 federal income tax return was prepared at the Mo' Money Taxes (MoneyCo) located on Mechanicsville Turnpike in Richmond.  Sutten provided the preparer with a copy of her paystub from T-Mobile and social security cards for her children.  The preparer falsely claimed an education credit on Sutten's return, when in fact Sutten did not attend college in 2010, did not incur any education expenses in 2010, did not tell the preparer

37

that she had any education expenses, and did not give any documentation to the preparer to indicate that Sutten had any education expenses in 2010.  The preparer included the education credit on Sutten's return without her knowledge.  Sutten did not receive a copy of her return after it was prepared.

114.     Similarly, Laquannda Williams' 2010 federal income tax return was prepared at the Mo' Money Taxes (MoneyCo) located on Hull Street in Richmond.  Williams provided the preparer with a copy of her Form W-2, social security card, and her mother's ID and social security card.  The preparer falsely claimed an education credit on Williams' return, when in fact Williams did not attend college in 2010, did not incur any education expenses in 2010, did not tell the preparer that she had any education expenses, and did not give any documentation to the preparer to indicate that Williams had any education expenses in 2010.  The preparer told Williams that she would get a bigger refund if she went to school in 2010, but Williams told the preparer she finished school in 2009.  The preparer nevertheless included the education credit on Williams' return without her knowledge, and did not provide Williams with a copy of her tax return.

115.     Customer Lena Hewlett's 2010 federal income tax return was also prepared at the Mo' Money Taxes (MoneyCo) location on Hull Street in Richmond.  The preparer falsely claimed an education credit on Hewlett's return, when in fact Hewlett did not attend college in 2010, did not incur any education expenses in 2010, did not tell the preparer that she had any education expenses, and did not give any documentation to the preparer to indicate that Hewlett had any education expenses in 2010.  The preparer included the education credit on Hewlett's return without her knowledge and did not give her a copy of her tax return.

**Jackson, Mississippi**

116.   Lameka Thompson's 2010 tax return was prepared by Mo' Money Taxes (MoneyCo) on McDowell Road in Jackson.  Thompson's return was prepared using her end-of-year paystubs.  Thompson told the return preparer that she was married, but the preparer falsely told Thompson she could file a return separately from her husband as head-of-household.  The preparer improperly claimed head-of-household status on Thompson's return.  Thompson and her husband lived with their three children.  The preparer claimed one of Thompson's children as a dependent on her return, but also claimed Thompson's nephew as a dependent, even though the preparer knew that the nephew did not live with Thompson.

117.   George Smith's 2010 and 2011 tax returns were prepared by Mo' Money Taxes (MoneyCo) located on McDowell Road in Jackson.  The preparer reported a dependent on Smith's returns who the preparer knew did not live with Smith and was not Smith's daughter, but was actually his fiancée's daughter.  The preparer also knew that Smith lived with his parents, but falsely reported his filing status as head-of-household.

118.   Tiffany Angrum, a customer of the Mo' Money Taxes (MoneyCo) located on McDowell Road in Jackson, was informed by the preparer that she could get a bigger refund on her 2010 tax return if she got a business license for a day care business (she had no such business) and if she claimed another dependent (which she also did not have).  Angrum said she would not do that.

119.   Customer Sherry Tate's 2010 federal income tax return was prepared at a Mo' Money Taxes (MoneyCo) located on Liberty Street in Canton, Mississippi, which is located near Jackson.  The preparer listed purported nephews on Tate's return who are not related to and are unknown to Tate.  Although Tate operated a tutoring service, she gave no receipts or other

information showing her income to the preparer to enable the preparer to complete an accurate

Schedule C.  Tate only provided the preparer with her ID, social security card, birth certificate,

and some business expense receipts.  Despite providing the preparer with receipts of her

expenses, no business expenses are reported on Tate's return.  Tate did not go to college or have

any education expenses in 2010, and the preparer reported a bogus education credit on her return.

The preparer included these bogus claims and dependents on Tate's return without her

knowledge, and did not provide Tate with a copy of her completed 2010 tax return.

120.    The United States has also filed lawsuits, civil and criminal, against specific Mo'

Money Taxes licensees and preparers.

**Nashville, Tennessee**

121.    The United States obtained a civil injunction on March 1, 2013 against a Mo'

Money Taxes licensee, Toney Fields, and preparer, Trumekia Shaw, in Nashville. *See United

States v. Fields, et al.*, 3:12-cv-1261 (M.D. Tenn.).  The Court permanently enjoined Fields and

Shaw from preparing federal tax returns for others.  As alleged in that complaint and above,

Fields and Shaw prepared tax returns making false claims for the EITC, based, in part, on bogus

dependents.  Fields and Shaw also included other bogus claims and deductions on their

customers' tax returns, including for purported charitable contributions and business expenses.

Fields and Shaw prepared returns using pay stubs rather than Forms W-2.  Fields and Shaw also

fabricated Forms W-2, often creating two Forms W-2, purportedly issued by two different

employers, on the same sheet of paper, and sometimes not even separating the two Forms W-2

which were maintained in their customers' files.

40

**Defendants' Willful Ignorance of Fraud**

122.   Despite knowing of the widespread and pervasive fraudulent conduct surrounding their tax return preparation business, and the well-publicized complaints, including those by the Better Business Bureau, online consumer protection sites, various local media outlets throughout the country, and in the several lawsuits filed by various states, the Defendants have not taken any meaningful steps to stop the misconduct.  Indeed, beginning with the 2013 filing season, the Defendants simply changed the names through which they conduct business from Mo' Money Taxes to Marquis Taxes, Southern King Taxes, and various other names.  In actuality, nothing has changed in the organizational structure of the business, and the Defendants, particularly Granberry and Robinson, still collect the same tax return preparation fees and bogus fees through Marquis Taxes, Southern King Taxes, and Caymau.

123.   To the extent the Defendants do not know of the fraud committed by their business, their ignorance is deliberate, and the Defendants intentionally ignore and turn a blind eye to complaints documenting their fraudulent practices.  The Defendants style themselves as savvy marketers and promoters of the Mo' Money Taxes brand and image – evidenced by their commercials – and frequently respond to media requests for comment on the several stories regarding the troubles surrounding their business.  Granberry, for example, has given several interviews to multiple news organizations regarding customers' allegations of improprieties at Mo' Money Taxes, and generally denies those allegations or, more commonly, falsely assigns blame to others not involved with Mo' Money Taxes, including its customers.

124.   Moreover, the Defendants have little incentive to stop the wrongdoing, because they directly profit from the misconduct at the Mo' Money Taxes, Marquis Taxes, and Southern King Taxes locations by taking a percentage of all gross revenues.  In addition, all or most of the

41

bogus fees for "service bureau," software, and tax return processing and transmission are fees that Granberry and Robinson ultimately retain. Accordingly, the Defendants promote a culture that favors volume and profits over accuracy and integrity, and creates an environment where fraudulent tax return preparation and violations of federal tax laws flourish.

125.    In 2012, Mo' Money Taxes added to customers' woes by issuing bad checks to customers. The bad checks delayed the customers' receipt of their tax refunds, which resulted in negative publicity and hastened the changing of the business' name. It did not, however, delay the Defendants' receipt of their unconscionably high fees, which they deducted directly from the customer's IRS refunds before issuing the bad checks for the remainder to customers.

### Failure to File Personal Tax Returns and Report Business Income

126.    The Defendants' disregard of the federal tax laws is further illustrated by their preparation (or lack thereof) of their own tax returns. Granberry, Robinson, MoneyCo, and Caymau fail to report income from the tax preparation business on their own tax returns and/or fail to file tax returns.

127.    MoneyCo and Caymau have never filed a federal income tax return. Mo' Money Taxes has not yet filed its 2011 federal income tax return. Granberry has not filed a 2011 federal income tax return and Robinson has not filed a 2009, 2010, or 2011 federal income tax return. Granberry has never reported any income from MoneyCo or Caymau on his federal income tax returns. Robinson has never reported any income from Caymau on his federal income tax returns.

### Harm Caused by the Defendants

128.    The Defendants' knowledge and encouragement of fraud at their businesses, negligent oversight of their managers, licensees, and preparers, false and misleading loan

products, and culture favoring volume and profits over accuracy and integrity, has harmed the public and the United States Treasury. These practices harm the public because the Defendants and their managers, licensees, and preparers prepare false or fraudulent tax returns that understate their customers' correct income tax liabilities and illegally cause their customers to incorrectly report their federal tax liabilities and underpay their taxes. Customers are harmed by the unconscionably high tax preparation and bogus fees and the false deceptive loan products tied to anticipated tax refunds.

129.    The Defendants' customers have been harmed because they relied on the Defendants and their managers, licensees, and preparers to prepare proper tax returns. Instead, customers' tax returns substantially understated their correct tax liabilities after paying unconscionably high fees to have their tax returns prepared. As a result, many customers, who are often low-income taxpayers, now face large income tax debts and may be liable for sizeable penalties and interest.

130.    The Defendants' fraudulent practices likewise harm the United States Treasury in the form of lost tax revenue. For instance, the IRS randomly sampled tax returns for tax year 2011 prepared by Mo' Money Taxes (MoneyCo) locations in Memphis, Atlanta, Richmond, and Jackson. Based on this study, the IRS estimated that the tax loss to the government from improper practices at these Mo' Money Taxes locations alone exceeded $9 million in 2011. Because this estimate focuses on four cities for a single tax year, and does not include a sampling of tax returns prepared in other locations in which this nationwide business operates, this estimate understates the harm done by all of the Defendants' businesses.

131.    The Defendants' misconduct further harms the United States and the public by requiring the IRS to devote scarce resources to detecting the fraud and assessing and collecting

43

lost tax revenues from defendants' customers.  IRS employees have spent thousands of hours conducting thousands of audits of tax returns prepared by the Defendants' business and interviewing hundreds of customers.  In addition, IRS employees have devoted still more time making repeated compliance visits to various franchises.  The Defendants have frustrated the IRS's compliance efforts by actively concealing their fraud from the IRS by, among other actions, fabricating federal tax documents.  Consequently, identifying and recovering all lost tax revenues resulting from the Defendants' fraudulent and illegal activities may be impossible.

132.    The Defendants' conduct also harms honest tax return preparers who refuse to engage in such illegal conduct.  Honest tax return preparers unfairly lose business to the Defendants as a result of the Defendants' willingness to break the law.  Customers often have their returns prepared with paystubs at the Defendants' businesses because law-abiding preparers do not prepare a tax return without an employer-issued Form W-2.

133.    Finally, the Defendants' misconduct harms the public at large by undermining public confidence in the federal tax system and encouraging widespread violations of the internal revenue laws.

134.    The harm to the government and the public will increase unless the Defendants are enjoined because—given the seriousness and pervasiveness of their illegal conduct—without an injunction, the Defendants are likely to continue enabling the preparation of false and fraudulent federal income tax returns for customers.  An injunction will serve the public interest because it will put a stop to the Defendants' illegal conduct and the harm that such conduct causes the United States and its citizens.

## Count I
## Injunction under I.R.C. § 7407

135.    The United States incorporates by reference the allegations in paragraphs 1 through 134.

136.    Section 7407 of the I.R.C. authorizes a district court to enjoin a tax return preparer from engaging in conduct subject to penalty under I.R.C. § 6694 or § 6695. Additionally, if the court finds that a preparer has continually or repeatedly engaged in such conduct, and the court further finds that a narrower injunction (i.e., prohibiting only that specific enumerated conduct) would not be sufficient to prevent that person's interference with the proper administration of the internal revenue laws, the court may enjoin the person from further acting as a tax return preparer. The prohibited conduct justifying an injunction includes, among other things, the following:

a.    Engaging in conduct subject to penalty under I.R.C. § 6694(a), which penalizes a return preparer who prepares a return or claim for refund that contains an unreasonable position and the return preparer knew (or reasonably should have known) of the position;

b.    Engaging in conduct subject to penalty under I.R.C. § 6694(b), which among other conduct, penalizes a return preparer who recklessly or intentionally disregards IRS rules or regulations;

c.    Engaging in conduct subject to penalty under I.R.C. § 6695(g), which penalizes a return preparer who fails to comply with the statutory due diligence requirements; or

d.    Engaging in any other fraudulent or deceptive conduct that substantially interferes with the proper administration of the internal revenue laws.

137.     Section 7701(a)(36), I.R.C., defines tax return preparer to include not only the individual who physically prepares a tax return for compensation, but also anyone "who employs one or more persons" to prepare tax returns for compensation.

138.     The Defendants, as shown above, are tax return preparers who have repeatedly and continually prepared or submitted returns or portions of returns (or employed or managed others who prepared or submitted returns or portions of returns) that contain unreasonable positions and substantially understate the liability for tax on the return.  The Defendants also advised, instructed, directed, and caused their managers, licensees, and preparers to engage in tax fraud, and to prepare federal income tax returns asserting unreasonable, unrealistic, frivolous and fraudulent positions.  Accordingly, the Defendants knew (or reasonably should have known) of the unreasonable, unrealistic, frivolous and fraudulent positions.

139.     The Defendants have continually and repeatedly engaged in conduct subject to penalty under I.R.C. § 6694 by preparing federal tax returns that understate their customers' liabilities based on unrealistic, frivolous and reckless positions. The Defendants, through the actions described above, recklessly or intentionally disregard IRS rules or regulations.

140.     The Defendants have continually and repeatedly engaged in conduct subject to penalty under I.R.C. § 6695. The Treasury regulations promulgated under I.R.C. § 6695(g) prohibit a return preparer from claiming the EITC without first conducting proper due diligence and documenting his or her compliance with the due diligence requirements. *See* 26 C.F.R. § 1.6995-2 (2011). The Defendants advise, encourage, and cause their managers, licensees, and preparers to circumvent these due diligence requirements and to ignore or disregard the information provided by customers.

141.    The Defendants' failure to comply with the due diligence requirements for the EITC violates Treasury Regulations and their willingness to falsify information to obtain the EITC for their customers shows a reckless and/or intentional disregard of IRS rules and regulations.

142.    The Defendants have continually and repeatedly prepared federal income tax returns that claim the EITC for customers where the defendants have not conducted, let alone documented, the required due diligence procedures.

143.    The Defendants also fail to comply with I.R.C. § 6695(a), which requires that a tax return preparer provide a copy of the completed tax return to the taxpayer.

144.    The Defendants' continual and repeated violations of I.R.C. §§ 6694 and 6695 fall within I.R.C. § 7407(b)(1)(A), and thus are subject to an injunction under I.R.C. § 7407.

145.    The Defendants' continual and repeated fraudulent or deceptive conduct that substantially interferes with the proper administration of the internal revenue laws, including but not limited to preparing federal income tax returns based on pay stubs and fabricating Forms W-2, falls within I.R.C. § 7407(b)(1)(D), and thus is subject to an injunction under I.R.C. § 7407.

146.    If they are not enjoined from all tax preparation, the Defendants are likely to continue to prepare and file false and fraudulent tax returns.

147.    The Defendants' continual and repeated conduct subject to an injunction under I.R.C. § 7407, including their continual and repeated fabrication of expenses and deductions, is so flagrantly illegal and so egregious that it demonstrates that a narrow injunction prohibiting only specific conduct would be insufficient to prevent the Defendants' interference with the proper administration of the internal revenue laws. Accordingly, the Defendants should be

permanently barred from acting as federal tax preparers, and from owning, operating, managing, controlling, licensing, franchising, or working for a tax return preparation business.

## Count II
## Injunction under I.R.C. § 7408

148.    The United States incorporates by reference the allegations in paragraphs 1 through 147.

149.    Section 7408 of the I.R.C. authorizes a district court to enjoin any person from engaging in conduct subject to penalty under either I.R.C. § 6700 or § 6701 if injunctive relief is appropriate to prevent recurrence of such conduct.

150.    Section 6701(a) of the I.R.C. penalizes any person who aids or assists in, procures, or advises with respect to the preparation or presentation of a federal tax return, refund claim, or other document knowing (or having reason to believe) that it will be used in connection with any material matter arising under the internal revenue laws and knowing that if it is so used it will result in an understatement of another person's tax liability.  Under I.R.C. § 6701(c)(1), the term "procures" includes "ordering (or otherwise causing) a subordinate to do an act," as well as "knowing of, and not attempting to prevent, participation by a subordinate in an act."

151.    The Defendants, through the actions detailed above, caused the presentation and preparation of false, fraudulent, and abusive tax returns and other documents.  The Defendants prepare, assist, and/or advise with respect to the presentation and preparation of federal tax returns for customers that they know will understate their correct tax liabilities, because the defendants knowingly prepare, assist, and/or advise with respect to the presentation and preparation of returns claiming bogus expenses and deductions and based on fabricated Forms W-2. The Defendants procured and assisted the preparation of false and fraudulent tax returns by

48

encouraging the filing of tax returns they knew were false or fraudulent, and by employing and supervising tax return preparers engaging in tax fraud. The Defendants' conduct is thus subject to a penalty under I.R.C. § 6701.

152.    In addition, the Defendants have not altered their behavior despite being previously warned and assessed penalties for similar conduct.  Given their occupations, the Defendants are likely to continue violating the law absent an injunction.  Tax return preparation is the Defendants' primary source of revenue.  To maximize that income, the Defendants counsel their managers, licensees, and preparers to prepare fraudulent returns.  That fraudulent conduct, in turn, gives the Defendants a competitive edge over law-abiding preparers.  It also provides a means for the Defendants to further exploit their unsophisticated customers by charging them unconscionably high fees, while defendants' fraud simultaneously and callously exposes their customers to possible civil and criminal liability.

153.    If the Court does not enjoin the Defendants, they are likely to continue to engage in conduct subject to penalty under I.R.C. § 6701. The Defendants' preparation of returns claiming improper expenses and deductions is widespread over many customers and tax years. Injunctive relief is therefore appropriate under I.R.C. § 7408.

### Count III
### Injunction under I.R.C. § 7402(a)
### Necessary to Enforce the Internal Revenue Laws

154.    The United States hereby incorporates by reference the allegations in paragraphs 1 through 153.

155.    Section 7402 of the I.R.C. authorizes a district court to issue orders of injunction as may be necessary or appropriate for the enforcement of the internal revenue laws.

156.    The Defendants, through the actions described above, including intentionally understating their customers' tax liabilities, fabricating Forms W-2, preparing and filing tax returns based on fabricated Forms W-2, and suborning perjury with respect to their customers' attestation that they reviewed true, correct, and complete copies of their tax returns, have engaged in conduct that substantially interferes with the enforcement of the internal revenue laws.

157.    Unless enjoined, the Defendants are likely to continue to engage in such improper conduct and interfere with the enforcement of the internal revenue laws. If the Defendants are not enjoined from engaging in fraudulent and deceptive conduct, the United States will suffer irreparable injury by wrongfully providing federal income tax refunds to individuals not entitled to receive them.

158.    While the United States will suffer irreparable injury if the Defendants are not enjoined, the Defendants will not be harmed by being compelled to obey the law.

159.    Enjoining the Defendants is in the public interest because an injunction, backed by the Court's contempt powers if needed, will stop the Defendants' illegal conduct and the harm it causes the United States.

160.    The Court should impose injunctive relief under 26 U.S.C. § 7402(a).

WHEREFORE, the United States of America prays for the following:

A. That the Court find that the Defendants have continually and repeatedly engaged in conduct subject to penalty under I.R.C. §§ 6694 and 6695, and have continually and repeatedly engaged in other fraudulent or deceptive conduct that substantially interferes with the administration of the tax laws, and that a narrower injunction prohibiting only this specific misconduct would be insufficient;

50

B. That the Court, pursuant to I.R.C. § 7407, enter a permanent injunction prohibiting the Defendants from acting as federal tax return preparers;

C. That the Court find that the Defendants have engaged in conduct subject to penalty under I.R.C. § 6701, and that injunctive relief under I.R.C. § 7408 is appropriate to prevent a recurrence of that conduct;

D. That the Court find that the Defendants have engaged in conduct that interferes with the enforcement of the internal revenue laws, and that injunctive relief is appropriate to prevent the recurrence of that conduct pursuant to the Court's inherent equity powers and I.R.C. § 7402(a);

E. That the Court, pursuant to I.R.C. §§ 7402(a), 7407, and 7408, enter a permanent injunction prohibiting the Defendants, and all those in active concert or participation with them, from:

    (1)    acting as federal tax return preparers or requesting, assisting in, or directing the preparation or filing of federal tax returns, amended returns, or other related documents or forms for any person or entity other than themselves;

    (2)    preparing or assisting in preparing federal tax returns that they know or reasonably should have known would result in an understatement of tax liability or the overstatement of federal tax refund(s) as penalized by I.R.C. § 6694;

    (3)    owning, operating, managing, working in, controlling, licensing, or franchising a tax return preparation business;

    (4)    falsifying or fabricating Forms W-2 or any other IRS form, filing false or fabricated Forms W-2 or any other IRS form, or aiding and abetting with the falsification or fabrication of or filing of false or fabricated Forms W-2 or any other IRS form;

    (5)    preparing or assisting in preparing federal tax returns that are based on end-of-year pay stubs rather than Forms W-2;

51

(6)     engaging in any other activity subject to penalty under I.R.C. §§ 6694, 6695, 6701, or any other penalty provision in the I.R.C.; and

(7)     engaging in any conduct that substantially interferes with the proper administration and enforcement of the internal revenue laws.

F. That the Court, pursuant to I.R.C. §§ 7402(a), 7407, and 7408, enter an order requiring the Defendants to contact, within fifteen days of the Court's order, by United States mail and, if an e-mail address is known, by e-mail, all persons for whom the Defendants and their managers, licensees, and preparers prepared federal tax returns or claims for a refund for tax years 2008 through 2012 to inform them of the permanent injunction entered against them, including sending a copy of the order of permanent injunction but not enclosing any other documents or enclosures unless agreed to by counsel for the United States or approved by the Court;

G. That the Court, pursuant to I.R.C. §§ 7402(a), 7407, and 7408, enter an order requiring the Defendants to produce to counsel for the United States, within fifteen days of the Court's order, a list that identifies by name, social security number, address, e-mail address, and telephone number and tax period(s) all persons for whom the Defendants and their managers, licensees, and preparers prepared federal tax returns or claims for a refund for tax years beginning in 2008 and continuing through this litigation;

H. That the Court, pursuant to I.R.C. §§ 7402(a), 7407, and 7408, enter an injunction requiring the Defendants to provide a copy of the Court's order to all of their principals, officers, managers, licensees, employees, and independent contractors within fifteen days of the Court's order, and provide to counsel for the United States within 30 days a signed and dated acknowledgment of receipt of the Court's order for each person whom the Defendants provided a copy of the Court's order;

52

I. That the Court retain jurisdiction over the Defendants and over this action to enforce any permanent injunction entered against them;

J. That the United States be entitled to conduct discovery to monitor the Defendants' compliance with the terms of any permanent injunction entered against them; and

K. That the Court grant the United States such other and further relief, including costs, as is just and reasonable.

DATED: April 9, 2013

EDWARD L. STANTON III
United States Attorney


 s/ Daniel A. Applegate
DANIEL A. APPLEGATE
JAMES C. STRONG
Trial Attorneys, Tax Division
U.S. Department of Justice
P.O. Box 7238, Ben Franklin Station
Washington, D.C.  20044
Telephone: (202) 353-8180
Fax: (202) 514-6770
Daniel.A.Applegate@usdoj.gov